## Schott et al. v. Schott's Ex'r.

March 21, 1944.

As Extended on Rehearing

May 16, 1944.

Chas. E. Keller, J. C. Cloyd, and W. G. Dearing for appellants.

A. M. Marret for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming in part and reversing in part.

Reference to 286 Ky. 208, 149 S.W. 2d 782, will furnish a history of the litigation and the court's conclusions on issues presented on appeal from orders dismissing appellants' answers and cross-petition. Appellants then were, as on this appeal, the residuary legatees under Dr. Schott's will, and creditors whose claims had been allowed in former partial settlement.

At the outset we are met with appellee's motion, passed to the merits, to dimiss the appeal as to the four heirs on the ground that they are residents of Germany, and not entitled to maintain an action undertaking to protect their property rights so long as the enemy status exists. The litigation was begun by appellee in 1931 in an action for settlement and advice, and the four were made defendants. We had the same sort of motion before us in Rau v. Rowe, 184 Ky. 841, 213 S.W. 226. Reference to that opinion will demonstrate that the motion is without merit. See also The Pietro Campanella, D. C., 47 F. Supp. 374; Ullmann v. Mayer, 180 Misc. 600, 41 N. Y. S. 2d 505; Verano v. De Angelis Coal Co., D. C., 44 F. Supp. 726. Fear that any proceeds which may be subject to distribution among the alien non-residents might become enemy funds may be dissipated by a compliance on the part of officers of the court, or the executor with General Orders, 5, 6 and 20 "Office of Alien Property Custodian," of February 9, 1943. The motion is denied.

When the case went back to the trial court, plead-

ings were filed and amended in such a way as to bring before the court, under our first opinion, the issue as to liability of the executor for damages occasioned by alleged negligence in failing to sell the real estate within two years after the death of Dr. Schott, and distribute any residue among the brothers and sisters. Their right, as the right of the creditors to raise this question, was determined in the former opinion, and is the law of the case. Appellants undertook to raise questions as to the legality of matters embraced in the first settlement. They also filed exceptions to certain items embraced in a settlement which appellee filed August 12, 1941. The commissioner in dealing with the exceptions later filed to the 1931 settlement, insofar as the legatees were concerned, concluded that there was no serious contention that they were not barred from reopening the case on this point, except as to some items in the settlement allowed, but not disbursed at the time. The creditors contend that by reason of certain expressions used in the first opinion they are not estopped from challenging numerous items embraced. We agree with the commissioner's conclusion that there is no distinction between creditors and heirs as to the effect of failure to file exceptions at the proper time.

The executor brought its accounts down to August of 1941. Appellants filed exceptions to disbursements in payment of certain taxes, to attorneys' and former commissioner's fees and court costs, and commissions paid to the representatives. The basis of the exceptions to these items was that they were unnecessarily paid; that the charges would not have arisen if settlement had been made within the two-year period, and if necessary were excessive. There were exceptions to an item of $185 representing the sale price of certain jewelry sold by the representative at that price, on the ground that it should have brought $781 had it been sold within the two-year period. Also exceptions based on a failure to account for automobiles and other personal property owned by decedent at the time of his death.

The most serious contention arises on exceptions to the report of sale of three pieces of real estate not sold within the two years as directed; these were houses on Barrett Avenue, St. Catherine Street and West Walnut Street. The charge as noted in our former opinion was that the representative by negligent failure to sell

within the period became liable in damages to the extent of the difference in claimed values during the period and the sales prices at later date.

A great deal of proof was taken, chiefly upon the values of the unsold properties during the two-year period and the prices for which they were finally sold, and bearing upon the question of negligence. Little proof was taken in respect of other items embraced in the 1941 report, fees, commissions, payment of taxes, etc., on the point of excessiveness. The matter was again referred to the commissioner who apparently expended considerable time and labor in the hearings and in filing a comprehensive report, and to which we will resort in stating his facts and conclusions, particularly in regard to the sale of the three pieces of real estate. We may remark here, as bearing on the controversial question, that upon his death Dr. Schott owned nineteen parcels of real estate; nine in Louisville, the others in the State of Texas. Between the date of his death and the expiration of the two-year·period executors sold the Texas property, with the exception of one lot and about which there is no complaint, most personal belongings were sold in 1928; some jewelry in 1930; the remainder including a diamond ring was sold in November 1931. All of the Louisville real estate was sold by the executor (at apparently fair prices) within the two-year period, except the three above-named lots, twelve days after the expiration of the two-year period.

The Barrett Avenue property was, at the time of Dr. Schott's death, used by him as a "sort of sanitarium," containing seventeen rooms. Describing its location and its condition and use, the commissioner found it to be a specialized piece of property, restricted to institutional purposes, not desirable as a dwelling. The property was under mortgage. It was valued by numerous real estate men testifying for contending parties, those for appellants fixing the value as of the two-year period at a mean average of $12,500; those for appellant about the same amount in 1928, but at much less, or about $6,500 in 1930, before the two-year period had expired. The property was listed in the real estate department of appellee and with the Louisville Real Estate Board at a higher figure. The commissioner called attention to the sharp conflict as to values, as between the two classes of expert witnesses.

The contention of appellee is that being a specialized property the market was limited, and that due to inactivity in the real estate market its efforts to sell were fruitless. The commissioner found that the real estate market was at its peak in 1928, with a gradual recession of activities until 1929; that later from 1929 to the fall of 1930, the closing of local banks had a decidedly depressing effect until the early part of 1933, since when there had been gradual improvement. He went into detail as to the activities and non-activities of the executor in the handling of the property, and concluded that there was a lack of showing of aggressive efforts to sell on the part of the representative during the two-year period. He concluded that the property was, during the period, of the value of $10,000, and with extra effort might have brought this sum. The property sold at auction after advertisement, the sale being fairly well attended, at $5,300; the commissioner recommended that the estate recover of the executor $4,700.

In respect of this property, it may be noted that a special judge, who sat in the case in earlier stages, had in a written opinion indicated that sale of the property within two weeks of the end of the period was a substantial compliance with the direction. The commissioner was inclined to agree with this conclusion, and it seems to us that two weeks' time would not have affected a $4,700 difference in the market. The fact is overlooked that under what is conceded to be the mandatory provision, the executor had all of two years to carry out the direction. During this period it would only have been liable for a gross abuse of judgment in making sale. To apply the penalty for lack of exercise of ordinary care would make the executor an insurer, and this has never been the rule.

In order to hold negligence under the conflicting evidence in this case, it would be necessary to show that in the two weeks' period there had been such a recovery in the real estate market that the property might have brought something like the experts estimated value, none of whom had endeavored to sell the property under the conditions prevailing.

The St. Catherine Street property, a four apartment house, was the subject of conflicting expert testimony as to its value during the two years and two

weeks' period following. For appellants experts placed its value at an average of $22,000. For appellees the value was fixed at an average of $12,000 with little chance of sale at such figure. At the time of testator's death it was encumbered to the extent of $20,000, and up to the time of being offered for sale in excess of $17,-500. Efforts to sell this property in the interim, about the same as applied to the other two parcels, were fruitless. Those who had it listed did not make great efforts because of the encumbrances of more than its value. This property was included in the auction sale at the time the other two parcels were offered, but no one would bid the amount of debt and the parcel was withdrawn. It was not offered at auction again, and there were no active efforts to consummate a sale, because of the encumbrance situation.

At some time after the attempted sale the first mortgage holder obtained a judgment enforcing its lien on a debt of approximately $10,000. On February 1, 1935, the holder purchased the property for $8,236.60, a little in excess of two-thirds of the appraised value. The property was sold free of liens, thus wiping out the lien of the second mortgage holder. While the commissioner concluded that the executor had not pursued aggressive methods in effort to sell, he found from the proof that during the period the property could not have sold for as much as the mortgage debts hence the estate had no equity so he recommended that the claim of appellants be disallowed, and we agree that the recommendation was proper.

The West Walnut Street property required different consideration. This was a brick house of about fifteen rooms, converted into a duplex, located in a section originally inhabited by white persons. Later there was an influx of colored persons and the neighborhood became what the witnesses term "mixed." It was valued by witnesses of appellees at an average of $4,750, as of the period, and as of April 30, 1930 at $4,500. Appellant's witnesses fixed it at $7,000. This parcel was under a $3,000 mortgage, and listed for sale as had been the other two parcels; the commissioner saying that "conventional" methods were used, though being offered at a price likely to discourage purchasers in the limited market. During the two-year period the representative sold this property to a colored woman for $6,500 (about its appraised value) who failed to perform

the contract. Witness for appellee said that the purchaser was the owner of other property, and apparently solvent. The witness, a former officer of the appellee company, did not undertake to explain why the contract was not enforced, merely saying that "we were unable to make her perform." This property was offered at auction on the same date as the other two, and was knocked off to a purchaser on a bid of $4,500. The purchaser failed to comply and there is little or no showing of effort to enforce compliance. There was no move to require a deposit at the time of sale as appears to be the custom, and correspondence between trust officers and the auctioneer, demanding his commission, shows that the executor waived deposit. The purchaser was relieved of her obligation by the payment of $175, this being the auctioneer's commission and costs.

Later the mortgage holder pursued foreclosure proceedings, and in February of 1935 purchased the parcel at decretal sale for $2,801, one dollar more than two-thirds of its appraised value. The commissioner worked out a liability on a different plan. He found the value to have been approximately $6,500, but since it was encumbered by a mortgage of $3,000 the estate had an equity of $3,500, had it been sold within the period, and the liability would be the difference between this sum and the mortgage debt. However, the commissioner analyzed the pleadings and finding that it was alleged that the damage was limited to $2,249, recommended allowance of that sum. He found the negligence here, as he viewed it, similar to that described in Melheiser v. General Trust Co., 237 Ky. 757, 36 S. W. 2d 377. The negligence there was because of failure of the auctioneer and executor to obtain a memorandum of the sale so as to permit compliance with the bid. We agree to the extent to which the principle applies, but the negligence here may be placed on broader grounds. The record shows that there were other bidders at the auction sale to whom the property might have been sold at $4,000. This property was shown to have been of considerable value as an investment. It sold in 1928 at $6,500; at the auction in 1930 at $4,500, during the times of depression which by many witnesses was shown to have improved after the spring of 1933, with no recession up to the time of sale.

From all the proof it may be well assumed that the property was of approximately the value reached

by the commissioner, and there is a decided lack of showing of aggressive effort to sell on a rising market. To our mind the damage here may be placed on the broader ground of a lack of the exercise of reasonable discretion. We are of the opinion that the commissioner reached a correct conclusion in respect of this parcel of property.

The inventory filed by the executor included a large diamond ring valued therein at $650, and a smaller ring at $75, together with other small pieces of jewelry, some of which were sold during the two-year period. The two rings were held until there had been filed a petition for advice upon which judgment was entered on the same day authorizing a sale of the rings at not less than $185. The large diamond (1½ karat) had been appraised at $300. The two were sold to Oscar Bader under sealed bid for $185. He had theretofore offered to buy at $175. He sold the small ring for $15. The commissioner found that a reliable jeweler had after examining the large ring, fixed its value around $800, saying that he thought it could have been sold "over the counter" for that sum during the period. The representative introduced a reputable jeweler who testified that he had examined the ring and that while diamonds sold at about $400 per karat in 1928 and 1929 they had depreciated to one-half the value after the 1929 crash. He did not testify as to values in November 1931. The evidence shows that an officer of appellee's had tried to sell the ring to "occasional prospects," but could get no satisfactory offer. His clientele consisted of two parties from whom he usually got bids. He fails to state what price he held on the jewelry. These rings were never advertised, nor were they included in the auction sale of other personal property. The records show that at this auction some personal property brought prices considerably above their appraised values.

The commissioner concluded that the executor negligently handled the sale of the rings and we agree. There is no effort to show why the rings were not offered at auction which would have afforded a reasonable showing of values. The rings were not sold for more than a year after the period fixed in the will, at a time when the market had gone down. It might have been the better judgment to have held them until resumption of values after 1933, instead of selling when "we were almost at the bottom of the depression."

The commissioner concluded almost gross negligence in the handling of the rings, but found difficulty in fixing extent of liability, but after analyzing the situation expressed the opinion that the "jewelry" with more aggressive methods, advertising, or offering at auction during the period, should have brought around $600. We take this to refer to the two rings. He measured the damage to the estate at $415, the difference between the sales price and his valuation from the proof. We can hardly agree on his estimation of the value. The basis was perhaps the testimony of the dealer who figured on sales over the counter with the customary element of profit on such sales, a matter on which there was little or no proof. The witness admitted that the stone was imperfect and not of modern cutting; that he had held a large diamond in his stock for twenty years before selling it. Considering the original appraisement, and the appraisement made at the time the order fixed an upset price together with the testimony of appellee's witness who fixed the value around $600 during the period and at $300 after the 1929 crash, we think the court would have been justified in fixing the value at $450. The executor should account for the difference, $280.

We agree with the Commissioner's conclusion that the first settlement or items embraced and allowed therein should not be subjected to attack for reasons set out in his report. However, he was in doubt as to the disallowance of certain items embraced in the 1941 purported final settlement, which included certain items of state income tax paid by the executor in the interim, excepted to by creditors and heirs-at-laws. These were properly disallowed. There were other items specifically objected to by parties. Attorney's fees, two items, one of March 6, 1932, $600, the other August 17, 1935, $700. The other items outside of attorney's fees, included commissioner's fees, court costs, deposition fees and a fee for translation of depositions taken in Germany. They also objected to items of commission paid to the Trust Company.

The Commissioner in disallowing these items commented that the exceptors did not contend that charges were excessive or would not be legitimate charges in a necessary settlement suit but were based solely on the frequently repeated ground that such charges would not have been necessary had the property been sold as pro-

vided in the will. The executor contended that since the estate was insolvent and a suit was necessary the expenditures were therefore necessary, and costs of administration and litigation properly chargeable against the estate. The commissioner commented: "Whether or not the estate was solvent and could have been so liquidated within a reasonable time without the necessity of settlement suit is very doubtful * * * The estate was never the lush estate that defendants have pictured it. I believe that if the executor had liquidated the estate shortly after Dr. Schott's death the estate would have been solvent. Your commissioner will not now hold that there were not reasonable grounds for the filing of the settlement suit." He disallowed these items on the basis of his conclusions.

Defendants, heirs and creditors filed exceptions to the Commissioner's report, challenging the disallowance of the items set up in their exceptions to the executor's last report, based on the same grounds set up in their first exceptions. Their contention was that the items challenged related to all expenditures made after the two-year period, which would include some items allowed in the first settlement. In their first exceptions the defendants specifically objected to the allowance of any attorneys' fees or any costs of litigation to be taxed against the estate. The court overruled these exceptions as to "administration expenses," because he thought the executor was not shown by the evidence to have been guilty of any devastavit.

The Commissioner in his report concluded that had the estate been promptly and perfectly administered there would have, perhaps, been ample funds for payment of creditors and administration costs, even though the heirs received nothing. He found that there had been, as we find, instances of negligence and carelessness in the handling of the estate; from his reading of the record he concluded that the old management (Trust Company) had "not done a first-class job." It was this mismanagement and neglect of the executor which prompted and justified the defendants in appearing and asserting their rights.

There may have been reasonable excuse for the filing of the suit asking advice as to future proceedings though since the defendants were not claiming a reconversion of the real estate it was incumbent on the

executor to use more speedy and more aggressive efforts to dispose of the property and wind up the estate. There is enough in the record to manifest a lack of interest in the management of the estate it was holding for the use and benefit of the creditors and beneficiaries under the will, at least to the extent indicated.

We said in Comingor v. Louisville Trust Co., 128 Ky. 697, 108 S.W. 950, 111 S.W. 681, 129 Am. St. Rep. 322, that no doctrine is better settled than that a trustee in the management of the entrusted estate should exercise the same care that an ordinarily prudent person would use in the conduct of his own affairs under similar circumstances. For any losses, deficiencies or injuries that may be occasioned by an affirmative or negative violation of this rule, the trustee is answerable, citing Perry on Trusts, sec. 770. In that case there were evidences of fraudulent transactions which justified restitution. However, we said that where a trustee is guilty of misconduct in the management of the estate he is not entitled to compensation. In Greenway's Adm'r v. Greenway, 266 Ky. 114, 98 S.W. 2d 283, we held the general rule to be that when a personal representative delays or neglects the settlement of an estate or the payment or distribution of funds when payable, or otherwise neglects his duty, the courts may disallow any compensation or less than might have been allowed had the duties been properly discharged. Anspacher v. Utterback's Adm'r, 252 Ky. 666, 68 S.W. 2d 15. Comingor case supra.

Giving the executor the benefit of any doubt, it may be said that it was justified in filing the initial suit seeking advice, though its position would have been much better had it sought advice before or at the end of the two-year period. Due to that doubt it is our opinion that the executor is entitled to commissions for sales and in the distribution of proceeds of all property sold during the two-year period and on the properties sold within the short period following the two-year limit. It should pay out of the estate funds the cost of that proceeding. It should be charged in its final settlement with all commissions on sales and distributions made after the the two weeks' period following the two-year limit. It is entitled to charge against the estate attorney's fees incident to the bringing and prosecution of the original action up to the time of the entry of the defendants by pleading. From that period on the court

in settlement should not allow any claim for counsel fees, costs of administration, costs of litigation to be paid from the estate funds which means that the 1941 settlement should be surcharged to this extent.

We have found it unnecessary to discuss the doctrine of equitable conversion as applied in cases where there is direction by testator to sell real estate and divide proceeds. The rule is that where there is such direction the realty is converted into personalty at the time of death, or at the time when the sale should have been made. Courts differ as to time of conversion, due to the particular language of the document. Here it seems to be agreed by parties that there was a conversion though disagreement as to time and effect. The disagreement would only affect the question of right to administer, the right to collect rents, care for the property. The general rule, applied under the circumstances of the case, is that such powers are incident to the power to sell, to carry out testator's intentions. 19 Am. Jur., Equitable Conversion. We think the commissioner rightfully concluded that the principle had little to do with the case in hand, further than stated, since there is no question of title involved by dower right or otherwise.

Such cases as have arisen in our jurisdiction, where the principle is applied, generally involved questions of title as between creditors and claimants of title to real estate. Ruh's Ex'r v. Ruh, 270 Ky. 792, 110 S. W. 2d 1097. Here there was no effort on the part of the heirs to work reconversion. Am. Jur., supra.

A careful examination of the record leads us to the conclusion that to do justice in this case we are compelled to affirm the judgment in part and reverse in part. The case is remanded with directions to set aside so much of the judgment as disallows damages resulting from negligence in the sale of the Walnut Street property and the diamond ring, and to disallow commissions, attorneys' fees and costs of litigation as indicated above, entering instead a judgment in conformity with this opinion as to these items. In other respects the judgment is affirmed.

Affirmed in part; reversed in part.